HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
MARK P. MEUSER (SBN: 231335)
mmeuser@dhillonlaw.com
GREGORY R. MICHAEL (SBN: 306814)
gmichael@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
Facsimile: (415) 520-6593

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT FOR

## THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| **MONICA SIX**, a California resident, **DEREK** and **LAURISUE MEDLIN**, California residents, **BAILEY BATTEN**, a California resident, and **KENNETH BALL**, a California resident,<br><br>  Plaintiffs,<br>  v.<br><br>**GAVIN NEWSOM**, in his official capacity as the Governor of California; **XAVIER BECERRA**, in his official capacity as the Attorney General of California; **MARK GHILARDUCCI**, in his official capacity as Director of the Governor's Office of Emergency Services; and **SONIA Y. ANGELL**, in her official capacity as the State Public Health Officer and Department of Public Health Director,<br><br>  Defendants. | Case No.: 8:20-cv-00877-JSF (DFMx)<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Judge:   Hon. Josephine L. Staton<br><br>1) **5TH AMENDMENT RIGHT TO TRAVEL;**<br>2) **5TH AMENDMENT RIGHT TO LIBERTY;**<br>3) **14TH AMENDMENT EQUAL PROTECTION;**<br>4) **5TH & 14TH AMENDMENTS DUE PROCESS & EQUAL PROTECTION; AND**<br>5) **CAL. CONST. ART. 1, §1 RIGHT TO LIBERTY** |

1



Plaintiffs, Monica Six, a California resident; Derek and LaurieSue Medlin, California residents; Bailey Batten, a California resident; and Kenneth Ball, a California resident; through their attorneys, Dhillon Law Group, Inc., bring claims against Gavin Newsom, in his official capacity as Governor of California; Xavier Becerra, in his official capacity as Attorney General of California; Mark Ghilarducci, in his official capacity as Director of the Governor's Office of Emergency Services; and Sonia Y. Angell, in her official capacity as the State Public Health Officer and Director of the California Department of Public Health. Plaintiffs allege and show the Court as follows (this "Complaint").

1.      On April 27, 2020, Attorney General William Barr sent a memorandum to all United States Attorneys regarding civil rights violations occurring in various states during the coronavirus crisis.[1]

2.      Attorney General Barr stated that "the Constitution is not suspended in times of crisis."

3.      In his memorandum, Attorney General Barr directs all United States Attorneys to identify state directives that could be violating the Constitutional rights and civil liberties of individual citizens. Attorney General Barr then directs that:

> If a state or local ordinance crosses the line from an appropriate exercise of authority to stop the spread of COVID-19 into an overbearing infringement of constitutional and statutory protections, the Department of Justice may have an obligation to address that overreach in federal court.

4.      This lawsuit is filed to challenge the very type of overbearing infringement of constitutional and statutory protections identified by Attorney General Barr.

## NATURE OF ACTION

5.      Defendants have used the Coronavirus pandemic to expand their authority by unprecedented lengths, depriving Plaintiffs and all other residents of California of

---

[1] Available as of May 7, 2020, at: https://cdn.cnsnews.com/attachment/ag_memo_-_balancing_public_safety_with_the_preservation_of_civil_rights_0.pdf.



First Amended Complaint                                          Case No. 8:20-cv-00877

fundamental rights protected by the U.S. and California Constitutions, especially but not limited to, the right to travel, the right to liberty, the right to the equal protection of the law, and the rights protected by the California Emergency Services Act. It is this Court's duty to defend these constitutional and statutory principles by safeguarding the rights and liberties of Californians that Defendants violate.

6.     This Action presents facial and as-applied challenges to the Governor of California's March 19, 2020 Executive Order N-33-20 (the "State Order") attached here as Exhibit 1.[2]

7.     The State Order and Defendants' enforcement thereof infringe upon (I) the right to travel under the Fifth Amendment, (II) the right to liberty under the Fifth Amendment, (III) the right to the equal protection of the laws under the Fourteenth Amendment, (IV) the rights protected by the California Emergency Services Act, and (V) the right to liberty under Article 1, Section 1 of the California Constitution.

## JURISDICTION AND VENUE

8.     This action arises under 42 U.S.C. § 1983 in relation to Defendants' deprivation of Plaintiffs' fundamental rights to liberty and freedom of travel under the Due Process clause of the Fifth Amendment of the U.S. Constitution, Plaintiffs' right to equal protection under the Fourteenth Amendment of the U.S. Constitution, and Plaintiffs' right to liberty under Article 1, Section 1 of the California Constitution.

9.     Accordingly, this Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief and damages under 28 U.S.C. § 1343(a); and attorneys' fees and costs under 42 U.S.C. § 1988.

10.     The Central District of California is the appropriate venue for this action pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) because it is the District in which

---

[2] Available as of May 7, 2020, at: https://covid19.ca.gov/img/Executive-Order-N-33-20.pdf.



First Amended Complaint                    Case No. 8:20-cv-00877

Defendants maintain offices, exercise their authority in their official capacities, and will enforce the State Order; and it is the District in which substantially all of the events giving rise to the claims occurred.

## PARTIES

11.     Plaintiff Monica Six is a resident of Orange County, California. On February 2, 2020, she became engaged to her fiancé. They excitedly planned their wedding for the second anniversary of their first date: April 21, 2020. They booked a wedding venue in Dana Point, Orange County, California. They purchased numerous wedding decorations and favors with the wedding date printed or engraved on them. They printed and mailed dated invitations to their guests just days before the official shut-down. The State Order caused Six's wedding venue to cancel its contract with her. Her wedding has now been rescheduled for later this summer, but the indefinite duration of the State Order makes it uncertain whether she will be able to get married on the new date, either. Without any certainty as to the end date of the State Order, she is unable to re-purchase invitations or decorations for her rescheduled wedding date. This has caused her significant financial hardship as well as ruined her idyllic wedding plans to get married in a special anniversary. That opportunity is now lost forever.

12.     Plaintiffs Derek and LaurieSue Medlin ("the Medlins") are residents of California. Their 20-year-old special-needs son functions at approximately a 5-year-old level. He lives at a non-medical residential home apart from his parents that provides 24/7 care. The Medlins are accustomed to visiting their son several times a week for at least two hours at a time. They even take him home with them for short periods of time each week. Ever since his school ended abruptly, their son has been confused about what is going on. Due to the State Order, their son's home is restricting their visits with their son to 30 minutes twice weekly. The Medlins are required to go to his home, let themselves into the fenced-in pool area, and talk to him through a 5-foot tall mesh fence. Mrs. Medlin is barely tall enough to see her son over the fence. They all wear masks and gloves. The Medlins' son does not have the capacity to understand why his



First Amended Complaint

parents will not come closer to him or visit him as often as they used to. He has had two mental breakdowns since the imposition of the State Order. He has harmed himself in the past, and the State Order has greatly increased the likelihood that he will do so again. It is harming his mental and emotional well-being. For the Medlins, it is excruciating to be forcibly separated from their son, to not know how he is doing, and be unable to give their son the physical affirmation and affection that he needs and is accustomed to.

13. Plaintiff Bailey Batten ("Batten") is a high school senior in San Diego County. The State Order has dramatically harmed her educational experience and her collegiate opportunities. She has missed out on school events including the prom, her soccer banquet, and her graduation ceremony which were all cancelled due to the State Order. She is a second-generation graduate from the same school as her mother, and her relatives from California and out of state were planning to attend the graduation. Further, the State Order is significantly harming her college plans to begin studies in the fall to become a doctor. She is not allowed to practice for the advanced placement exams with her peers and friends and is forced to study on her own. These exams are critical to qualifying for scholarships. The possibility that the State Order could remain in place indefinitely is forcing her to give up her dreams to pick a college that would best suit her aspirations. Instead, she may be forced to settle for a local college that is not an ideal fit for her degree program, which could still be closed for the fall semester due to the State Order. The State Order has disrupted her senior year of high school and is threatening to derail her college plans. Without being able to properly study for advanced placement exams, she may completely miss out on opportunities that she would have enjoyed if the State Order had not been imposed.

14. Plaintiff Kenneth Ball ("Ball") is a resident of Butte County. He is a musician with over 60 years of experience playing reed instruments. He is a member of the Chico Community Concert Band. They used to perform in a variety of venues, both private and city-wide. Their gigs included the Thursday night Farmer's Market event



First Amended Complaint

Case No. 8:20-cv-00877

1  and the Friday night Concert in the Plaza. All this ended with the imposition of the State

2  Order. All of Ball's events have been cancelled. Even worse, he is also prohibited from

3  practicing his instrument with his fellow musicians. Although his instrument cannot be

4  played while wearing a mask, his band has access to facilities where each of the

5  musicians can maintain safe social distancing and avoid spreading any infection. Yet

6  the State Order bans him and his fellow musicians from even this opportunity. He is

7  restricted now to playing solos on his saxophone for his Wednesday night men's Bible

8  study via Zoom video conferencing. Music is an emotional outlet for Ball, his fellow

9  musicians, and everyone who listens to them play. The State Order's ban of Ball's

10  musical pursuits is devastating to him and his fellow musicians.

11       15.    Defendant Gavin Newsom ("Newsom") is made a party to this Action in

12  his official capacity as the Governor of California. *See, e.g.*, *Ex Parte Young*, 209 U.S.

13  123 (1908). The California Constitution vests the "supreme executive power of the

14  State" in the Governor, who "shall see that the law is faithfully executed." Cal. Const.

15  Art. V, § 1. Also, Newsom signed the State Order on March 19, 2020.

16       16.    Defendant Xavier Becerra ("Becerra") is made a party to this Action in his

17  official capacity as the Attorney General of California. *See, e.g.*, *Ex Parte Young*, *supra*.

18  Under California law, Becerra is the chief law enforcement officer with supervision

19  over all sheriffs in the State. Cal. Const. Art. V, § 13.

20       17.    Defendant Mark Ghilarducci ("Ghilarducci") is made a party to this Action

21  in his official capacity as Director of the Governor's Office of Emergency Services.

22  *See*, *e.g.*, *Ex Parte Young*, *supra*. Under the State Order, Ghilarducci is tasked with

23  enforcement of the State Order.

24       18.    Defendant Sonia Y. Angell, MD, MPH ("Dr. Angell") is made a party to

25  this Action in her official capacity as the Director and State Public Health Officer. *See*,

26  *e.g.*, *Ex Parte Young*, *supra*. Dr. Angell is sued herein in her official capacity to

27

28



First Amended Complaint                               Case No. 8:20-cv-00877

challenge the constitutionality of her office's list of "Essential Critical Infrastructure Workers" issued to complement Newsom's Executive Order.[3]

19.     Each Defendant acted under color of state law with respect to all acts or omissions alleged here.

## FACTUAL ALLEGATIONS

20.     On or about March 13, 2020, President Donald J. Trump proclaimed a National State of Emergency as a result of the threat of the emergence of a novel coronavirus, COVID-19.[4]

21.     Since the initial outbreak of COVID-19 in the United States in February and March 2020, the federal government's projections of the anticipated national death toll related to the virus has decreased substantially. Despite such revisions, Defendants have increasingly restricted or banned constitutionally-protected activities.[5] [6]

## GOVERNOR NEWSOM'S ACTIONS

22.     On or about March 4, 2020, Newsom proclaimed a State of Emergency because of the COVID-19 threat.[7]

23.     On or about March 19, 2020, Newsom issued Executive Order N-33-20 in which he ordered "all residents … to immediately heed the current State public health directive[]" of that same date.[8]

---

[3] Available as of May 7, 2020, at:
https://covid19.ca.gov/img/EssentialCriticalInfrastructureWorkers.pdf.
[4] Available as of May 7, 2020, at: https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.
[5] See, e.g.,
https://www.usatoday.com/story/news/investigations/2020/04/09/coronavirus-deaths-u-s-could-closer-60-k-new-model-shows/5122467002/.
[6] See, e.g., https://www.wsj.com/articles/surfs-upand-so-are-tensionsafter-california-closes-beaches-11588539203.
[7] Available as of May 7, 2020, at: https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf.
[8] See, supra, n.2. The State Public Health Directive was included in the State Order.

7



First Amended Complaint                                    Case No. 8:20-cv-00877

24.     The state public health directive requires "all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors[.]"[9]

25.     The public health directive provides that its directives "shall stay in effect until further notice." Ex. 1.[10]

26.     None of the powers explicitly granted under the California State Emergency Services Act allow Newsom to sequester every Californian within their homes.[11]

27.     Under the California States Emergency Services Act, the only powers restricting freedom of travel were granted in very limited measure to *local* authorities in a *local* emergency, not the Governor in a statewide emergency.[12]

## NEWSOM ARBITRARILY EXEMPTS CERTAIN BUSINESSES—INCLUDING CANNABIS RETAIL STORES—FROM THE STATE ORDER WITHOUT A COMPELLING STATE INTEREST

28.     The State Order went on to acknowledge that the federal government had "identified 16 critical infrastructure sectors whose assets, systems, and networks, whether physical or virtual, are considered so vital to the United States that their incapacitation or destruction would have a debilitating effect on security, economic security, public health or safety, or any combination thereof" such that Newsom ordered that "Californians working in these 16 critical infrastructure sectors continue their work because of the importance of these sectors to Californians' health and well-being."[13]

---

[9] *Id.*

[10] *Id.*

[11] Cal. Gov't Code § 8565, *et seq.*

[12] Cal. Gov't Code § 8634 (authorizing local curfews under very limited circumstances).

[13] *See*, *supra*, n.2.



First Amended Complaint                                    Case No. 8:20-cv-00877

29.     Newsom then made arbitrary exceptions, including declaring that cannabis retail stores were "essential" after pressure from the United Cannabis Business Association.[14]

30.     On or about March 22, 2020, the California Public Health Officer designated a list of "Essential Critical Infrastructure Workers." This list was updated on April 28, 2020.[15] This list included cannabis.

31.     The federal guidelines for essential infrastructure that Newsom referenced in the State Order make no mention of cannabis retail stores.[16]

32.     Further, cannabis retail stores operate in violation of federal law. *Taylor v. United States*, ____ U.S. ____, 136 S. Ct. 2074, 2080 (2016).

33.     The State Order permits violations of federal law, but prohibits the Plaintiffs from exercising their constitutional rights to liberty and to travel and to enjoy the equal protection of the laws.

### THE STATED PURPOSE OF THE STATE ORDER WAS TO "BEND THE CURVE," OR REDUCE TRANSMISSION RATES TO MANAGEABLE LEVELS

34.     At a press conference on March 19, 2020, Newsom repeatedly said the rationale for the State Order was to "bend the curve."[17] He also said "[t]he point of the stay at home order is to make those numbers moot"[18] and put them "in the dustbin of history."[19] He added that one goal was to slow down transmission enough to reduce the

---

[14] *See, e.g.*, https://www.wsj.com/articles/california-deems-pot-an-essential-coronavirus-business-11585005903 (last visited on May 7, 2020).
[15] *See, supra*, n.3.
[16] Available as of May 7, 2020, at: https://www.cisa.gov/identifying-critical-infrastructure-during-covid-19.
[17] March 19, 2020 press briefing at 0:30-0:35, 8:10-8:20, 10:00-10:15, 24:20-24:30, 33:45-33:55, and 35:17-36:00, available as of May 7, 2020 at: https://www.youtube.com/watch?v=8OeyeK8-S5o.
[18] *Id.* at 35:10-35:20.
[19] *Id.* 33:55-34:05.



First Amended Complaint                              Case No. 8:20-cv-00877

strain it might place on hospital resources.[20] It is this laudable goal of "bending the curve," that Newsom has now tossed into the dustbin, in favor of an ever-shifting goalpost just out of reach of California's citizens.

35.     In a letter he wrote to President Trump the day before on March 18, 2020, Newsom projected that 56 percent of Californians, or roughly 25.5 million people, could be infected over the next eight weeks.[21]

36.     His letter went on to say that "[i]n some parts of our state, our case rate is doubling every four days."[22]

37.     Newsom expounded on these numbers at his March 19 press conference. He explained that a hospitalization rate of 20 percent could mean that California would face a shortfall of 19,543 hospital beds above the state's current capacity of approximately 78,000 beds.[23] He added that California had a surge capacity of 10,207 additional beds that could partially offset this shortfall.[24] Thus, he was predicting a total shortfall of approximately 9,336 beds.[25]

38.     Mark Ghaly, the governor's Secretary of Health and Human Services, explained that the state came up with the 56 percent estimate by "[u]sing the available literature, advice from the CDC and our understanding and experience in California, we applied a variety of different measures that looked at an attack rate, that looked at the $R_0$ … we looked at … hospitalization rates that we had available as well as other outcome measures."[26]

---

[20] *Id.* at 5:42-8:09.
[21] Available as of May 7, 2020, at: https://www.gov.ca.gov/wp-content/uploads/2020/03/3.18.20-Letter-USNS-Mercy-Hospital-Ship.pdf.
[22] *Id.*
[23] March 19, 2020 press briefing, *supra*, at 5:40-7:32.
[24] *Id.* at 7:20-7:40.
[25] *Id.*
[26] *Id.* at 28:49-31:11.



First Amended Complaint                                      Case No. 8:20-cv-00877

39.     The Secretary also stated that "[w]e knew that the attack rate of 56 percent that we chose was somewhat in the middle between the high-end and the low-end of what we'd seen in the literature . . . ."[27]

40.     Newsom admitted that his numbers did not account for any mitigation measures put in place. Rather, those numbers assumed that "we're just along for the ride[.]"[28]

41.     Contrastingly, several infectious disease experts, including Professor of Epidemiology John P.A. Ioannidis of Stanford University, called this an extreme, worst-case scenario that was unlikely to happen.[29] They proved correct.

## NEWSOM ADMITS AND DATA SHOWS THAT THE CURVE HAS BEEN BENT, SO THE STATE ORDER SHOULD BE TERMINATED

42.     On April 16, 2020, during a briefing, Newsom stated that "[we] have successfully bent and arguably flattened the curve in the state of California."[30]

43.     As of May 5, 2020, nearly seven weeks after Newsom's announcement, the number of COVID-19 cases so far in California according to the California Department of Public Health is 58,815 with the total number of *confirmed* cases requiring hospitalization—including ICU treatment—was 4,474.[31]

---

[27] *Id.*

[28] *Id.* at 24:20-24:40.

[29] *Newsom: 56 % of Californians Could Get Coronavirus If Nothing Is Done*, San Francisco Chronicle, March 19, 2020, available as of May 7, 2020 at: https://webcache.googleusercontent.com/search?q=cache:sokxG9_b-2oJ:https://www.sfchronicle.com/health/article/Newsom-56-of-Californians-could-get-coronavirus-15144438.php+&cd=1&hl=en&ct=clnk&gl=us.

[30] April 16, 2020 briefing by the Governor at 37:20, transcript available as of May 7, 2020, at: https://www.rev.com/blog/transcripts/gov-gavin-newsom-california-covid-19-briefing-transcript-april-16.

[31] https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/ncov2019.aspx (last visited on May 7, 2020).

---

11



First Amended Complaint                                    Case No. 8:20-cv-00877

44. As of May 5, 2020, according to the California Department of Public Health, the total number of *suspected* COVID-19 cases—including ICU treatment—was 1,622. Adding these together yields a total of 6,096 patients requiring hospitalization statewide.[32]

45. These numbers were compiled from the reports of 98% of all hospitals in California.[33]

46. This is a far cry from the 20 % hospitalization rate of the 56 percent infection rate predicted by Newsom in his March 19, 2020, press conference. Such figures would represent approximately 5 million Californians. Without minimizing its significance, 6,096 patients statewide when compared to Newsom's projection of 25.5 million infections, over 5 million total hospitalizations, nearly 100,000 simultaneous hospitalizations, and a 9,336-bed shortfall, shows at a minimum that Newsom has relied on grossly faulty numbers since the imposition of the State Order. Neither the California infection rate nor hospitalization rate are anywhere near Newsom's estimates.

47. On information and belief, part of the data that Newsom depended on for his claim of 25.5 million infections in California within eight weeks in his March 18, 2020, letter was the initial rate of infection in Wuhan, the originating epicenter of COVID-19. Then, the numbers apparently showed a frightening $R_0$ of 5.7.[34]

---

[32] *Id.*

[33] As of May 7, 2020, available at: https://public.tableau.com/views/COVID-19PublicDashboard/Covid-19Hospitals?%3Aembed=y&%3Adisplay_count=no&%3AshowVizHome=no.

[34] Sanche S, Lin YT, Xu C, Romero-Severson E, Hengartner N, Ke R. High contagiousness and rapid spread of severe acute respiratory syndrome coronavirus 2. As of May 7, 2020, available at: https://doi.org/10.3201/eid2607.200282 and: https://wwwnc.cdc.gov/eid/article/26/7/20-0282_article.

First Amended Complaint                                    Case No. 8:20-cv-00877

DIG
DHILLON LAW GROUP INC.

48.     However, now the $R_0$ of COVID-19 without mitigation efforts is understood to be approximately 2.2-2.7.[35] With mitigation efforts, the $R_0$ of COVID-19 has been driven further down.

49.     The current $R_0$ for California is estimated to be 0.83 and has remained at or below 0.84 since approximately April 21, 2020.[36]

50.     Effective lowering of the $R_0$ of COVID-19 need not be done with draconian shutdown orders. Social distancing and facial coverings suffice. For example, one factor attributed to South Korea and Japan's relatively low COVID-19 cases—despite the lack of extensive shutdowns—is the cultural practice of bowing to one another in greeting instead of shaking hands.[37] Even in countries that have imposed shutdowns, such practices have also been credited for avoiding high infection rates. India and Thailand, with their practice of greeting others with prayer hands, are such examples.[38]

51.     On April 27, 2020, a revised study released by a team at Stanford University estimated that, based on antibody tests of 3,300 people, as much as 4.16% of Santa Clara County's population (81,000 people), had already contracted COVID-19 by April 3 and 4, 2020.[39] Santa Clara had 39 deaths as of April 4, 2020[40] out of a county population of 1,927,852.17.[41] This means that the death rate of those who had COVID-19 is 0.048%.

---

[35] *Id.*

[36] As of May 7, 2020, available at: https://rt.live/.

[37] As of May 7, 2020, available at: https://www.nytimes.com/2020/05/03/world/asia/coronavirus-spread-where-why.html.

[38] *Id.*

[39] As of May 7, 2020, accessible at: https://www.medrxiv.org/content/10.1101/2020.04.14.20062463v2.full.pdf.

[40] As of May 7, 2020, accessible at: https://www.santaclaraca.gov/i-want-to/stay-informed/newsroom/coronavirus-updates/archived-covid-19-news-updates.

[41] As of May 7, 2020, available at: https://www.census.gov/quickfacts/fact/table/santaclaracountycalifornia/PST045219.

First Amended Complaint                                          Case No. 8:20-cv-00877

52.     On April 10, 2020, Los Angeles County had 8,430 confirmed cases 241 deaths;[42] on April 11, 2020, Los Angeles County had 8,873 cases and 265 deaths, for an approximate death rate of 2.98 percent.[43] On April 20, 2020, the preliminary results of a collaborative antibody study done between the University of South California and the Public Health Department of Los Angeles County were released. Based on 863 tests, researchers estimated that as many as 5.6 percent of the L.A. County's population, or 442,000, already had COVID-19 on April 10 and 11.[44]

53.     A similar antibody test in and by New York City showed that 21 percent of the population (1,763,737) were infected with COVID-19.[45] With the current number of confirmed deaths (12,571),[46] the putative death rate is 0.71 percent.

54.     A similar antibody study by Miami-Dade County told a similar story: the confirmed number of deaths (1,268)[47] divided by the estimated number of infections (221,000)[48] gave a putative death rate of 0.57 percent. Each of these studies indicates

---

[42] As of May 7, 2020, accessible at: http://publichealth.lacounty.gov/phcommon/public/media/mediapubdetail.cfm?unit=media&ou=ph&prog=media&prid=2309.

[43] As of May 7, 2020, accessible at: http://publichealth.lacounty.gov/phcommon/public/media/mediapubdetail.cfm?unit=media&ou=ph&prog=media&prid=2311.

[44] As of May 7, 2020, accessible at: http://www.publichealth.lacounty.gov/phcommon/public/media/mediapubhpdetail.cfm?prid=2328.

[45] As of May 7, 2020, accessible at:https://www.nytimes.com/2020/04/23/nyregion/coronavirus-antibodies-test-ny.html. The estimated population of NYC is 8,398,748 as of July 1, 2018 per https://www.census.gov/quickfacts/newyorkcitynewyork.

[46] As of May 7, 2020, accessible at: https://www1.nyc.gov/site/doh/covid/covid-19-data.page.

[47] As of May 7, 2020, accessible at: https://www.miamiherald.com/news/coronavirus/article242395581.html.

[48] As of May 7, 2020, accessible at: https://www.miamidade.gov/releases/2020-04-24-sample-testing-results.asp.

14



that the COVID-19 mortality rate falls significantly short of those associated with other epidemics, including the 1917-1918 Spanish Flu, believed to have caused at least 2.5 percent of the infected to die.[49]

55.     Studies and health data show that the State Order would not only be of no benefit to preventing the transmission of COVID-19 or death from it—it could actually be detrimental to such efforts.

56.     First, open air and sunlight (whether the mechanism of action is UV radiation or thermal energy) reduce the likelihood of transmission; the open air seemingly dissipates viruses to a negligible amount,[50] while sunlight lessens the lifetime of an infectious, viral particle.[51] [52] A Department of Homeland Security official revealed that the preliminary results from a study showed that sunlight and high temperatures could destroy a COVID-19 viral particle within minutes.[53]

57.     Second, COVID-19 seems to most severely affect those with underlying medical issues. The lack of access to fresh air, sunlight, exercise and social companionship (even from six feet away) may be detrimental, if not downright deadly, to the physical and psychological health of humans.[54] Substance abuse relapse, lower

---

[49] As of May 7, 2020, accessible at:
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3291398.
[50] As of May 7, 2020, accessible at:
https://www.medrxiv.org/content/10.1101/2020.04.04.20053058v1.
[51] As of May 7, 2020, accessible at:
https://www.sciencedirect.com/science/article/pii/S016609340400179X (similar coronavirus, the one that causes the SARS outbreak, is vulnerable to UV radiation).
[52] As of May 7, 2020, accessible at: https://www.newsweek.com/sunlight-killscoronavirus-scientist-1500012.
[53] As of May 7, 2020, accessible at: https://www.reuters.com/article/us-health-coronavirus-trump/sunlight-heat-and-humidity-weaken-coronavirus-u-s-officialsays-idUSKCN2253SA.
[54] City Council meeting with video showing discussions with doctors at Hoag Hospital about observing increase in at 11:55-12:10, available as of May 7, 2020 at:
http://newportbeach.granicus.com/MediaPlayer.php?view_id=44&clip_id=3477.



First Amended Complaint                                                    Case No. 8:20-cv-00877

immune system response, and higher risks for other medical conditions leaves one more vulnerable to COVID-19 transmission, infection, and death.[55]

58.    Finally, official health bodies do not recommend the closure of public spaces and or the implementation of major, internal travel restrictions. For example, the CDC's official mitigation guidelines for COVID-19 make no mention of closing public parks or breaches.[56] WHO and European CDC guidelines also advise against "internal travel restrictions" during a pandemic because they have little effect on reducing transmission, while imposing huge social and economic costs.[57] There is little to no scientific support for Defendants' shutdowns of local and state beaches, parks, and other open spaces.

59.    The State Order should be terminated because: (1) the State and the people of California are now aware through public information campaigns and the procurement of medical resources for COVID-19; (2) the citizenry has been educated on and is implementing attack rate mitigation efforts through social distancing, hygiene, mask wear, and other means; (3) the information the State Order was based on was flawed; and (4) the attack rate has been reduced to a manageable level which other governments have used as a rule of thumb to lift COVID-19 restrictions.

---

[55] As of May 7, 2020, accessible at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

[56] As of May 7, 2020, available at: https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigation-strategy.pdf.

[57] "There is limited evidence for the effectiveness of internal travel restrictions, and it has legal, ethical and economic implications. Although 37% of national pandemic preparedness plans of Member States have travel restriction plans as a component of NPIs (65), the acceptability is still undetermined." World Health Organization, *Nonpharmaceutical public health measures for mitigating the risk and impact of epidemic and pandemic influenza*, at p. 71, as of May 7, 2020, available at: https://apps.who.int/iris/bitstream/handle/10665/329438/9789241516839-eng.pdf?ua=1; *see also* European Centre for Disease Prevention and Control, *Public Health Measures for Influenza Pandemics*, p. 9, § 12 ("Internal travel restrictions [have] minor delaying effect[s and] [m]assive [costs and risks], including social disruption.").

First Amended Complaint                    Case No. 8:20-cv-00877

## CALIFORNIA FEDERAL COURTS ARE TREATING FEDERAL AND STATE EXECUTIVE ORDERS DIFFERENTLY

60.     A troubling dichotomy has emerged in California federal courts during the COVID-19 pandemic.

61.     Some courts have given broad deference to the state executive branch, even when it infringes upon fundamental rights, such as by the State Order.[58]

62.     At the same time, other courts have closely scrutinized the constitutionality of the exercise of federal executive power, striking down many executive actions taken by President Trump.

63.     For example, in *United States v. California*, 921 F.3d 865 (9th Cir. 2019), the Court allowed states to order state law enforcement to be uncooperative with federal immigration authorities.

64.     Similarly, in *California v. Trump*, 407 F.Supp.3d 869, 892 (N.D. Cal. 2019), the court gave a close reading to 10 U.S.C. § 2801(a)'s use of the term "military installation" to bar President Trump's use of military funds for a border wall despite acknowledging that he was in the right in his declaration of a state of emergency.

65.     Finally, in *Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1087-88 (9th Cir. 2020), the Court went so far as to cite U.S. obligations to asylum seekers under a U.N. refugee treaty in rejecting President Trump's rule that asylum seekers "must enter through official port of entry."

66.     California's federal courts have treated claims challenging executive actions, including under emergency authority, very differently depending upon which executive is claiming broad deference.

///

---

[58] *Gish v. Newsom*, 5:20-cv-00755, Doc. #51 (D.C. C.D 4/23/20); *Cross Culture Christian Center v. Newsom*, 2:20-cv-00832, Doc. #23 (D.C. E.D. 5/5/20)



First Amended Complaint

Case No. 8:20-cv-00877

# FIRST CLAIM FOR RELIEF
## VIOLATION OF THE FIFTH AMENDMENT OF THE U.S. CONSTITUTION
### Right to travel as enforced by 42 U.S.C. § 1983
### (*By All Plaintiffs against All Defendants*)

67.    Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

68.    While not explicitly defined in the U.S. Constitution, the Supreme Court has "acknowledged that certain unarticulated rights are implicit in enumerated guarantees. … Yet these important but unarticulated rights [association, privacy, presumed innocence, etc.] have nonetheless been found to share constitutional protection in common with explicit guarantees." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 579-580 (1980).

69.    "The right to travel is a part of the liberty of which the citizen cannot be deprived without the due process of law under the Fifth Amendment." *Kent v. Dulles*, 357 U.S. 116, 127 (1958).

70.    Courts have found that "[f]reedom of movement is kin to the right of assembly and to the right of association. These rights may not be abridged." *Aptheker v. Secretary of State*, 378 U.S. 500, 520 (1964) (Douglas, J., concurring). "Once the right to travel is curtailed, all other rights suffer, just as when curfew or home detention is placed on a person." *Id*.

71.    The Supreme Court has found that this right to travel includes in-state, intra-state, or foreign travel. *See e.g. Kent v. Dulles*, 357 U.S. at 126 "Freedom of movement across frontiers in either direction, and inside frontiers as well, was a part of our heritage."

72.    The reason that the right to travel is fundamental is because "[f]reedom of movement, at home and abroad, is important for job and business opportunities – for cultural, political, and social activities – for all the commingling which gregarious man enjoys." *Aptheker*, 378 U.S. at 519-520 (1964); *see also Kent*, 357 U.S. at 126 ("[t]ravel



First Amended Complaint

Case No. 8:20-cv-00877

abroad, like travel within the country, may be necessary for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values").

73.     Even though California remains in a declared state of emergency, and people may abuse the right to travel, citizens do not lose their Constitutional rights. *See Aptheker,* 378 U.S. at 520 "Those with the right of free movement use it at times for mischievous purposes. But that is true of many liberties we enjoy. We nevertheless place our faith in them, and against restraint, knowing that the risk of abusing liberty so as to give rise to punishable conduct is part of the price we pay for this free society."

74.     When a government practice restricts fundamental rights such as the right to travel, it is subject to strict scrutiny, and may be justified only if it furthers a compelling government purpose, and, even then, only if no less restrictive alternative is available. *See, e.g. Memorial Hospital v. Maricopa County*, 415 U.S. 250, 257-258 (1974); *Dunn v. Blumstein*, 405 U.S. 330, 339-341 (1972); *Shapiro v. Thompson*, 394 U.S. 618, 89 (1969), *Maher v. Roe*, 432 U.S. 464, 488 (1977).

75.     The State Order mandates that Californians stay at home, and shut down their "Non-Essential" businesses.

76.     The State Order caused Six's wedding venue to cancel its contract with her.

77.     The State Order violates Six's fundamental constitutional right to liberty in the form of her right to marry.

78.     The State Order violates the Medlins' fundamental constitutional right to visit their son and spend time with him.

79.     The State Order violates Batten's fundamental rights of free association and travel.

80.     The State Order violates Balls' fundamental rights of free association, travel, and the right to earn a living.

81.     Unless enjoined, Defendants will act under color of state law to deprive



1   Plaintiffs of their right to travel as protected by the Due Process Clause.

2        82.     Plaintiffs have no adequate remedy at law and will suffer serious and

3   irreparable harm to their constitutional rights unless Defendants are enjoined from

4   implementing and enforcing the State Order.

5        83.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to

6   declaratory relief and temporary, preliminary, and permanent injunctive relief

7   invalidating and restraining enforcement of the State Order.

8        84.     Plaintiffs found it necessary to engage the services of private counsel to

9   vindicate their rights under the law. Plaintiffs are therefore entitled to an award of

10  attorneys' fees pursuant to 42 U.S.C. § 1988.

11                          **SECOND CLAIM FOR RELIEF**

12      **VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH**

13            **AMENDMENT OF THE U.S. CONSTITUTION**

14            **Right to liberty as enforced by 42 U.S.C. § 1983**

15                **(*By All Plaintiffs against All Defendants*)**

16      85.     Plaintiffs incorporate herein by reference each and every allegation

17  contained in the preceding paragraphs of this Complaint as though fully set forth herein.

18      86.     The Fifth Amendment of the U.S. Constitution declares that "[n]o person

19  shall … be deprived of life, liberty, or property without due process of law."

20      87.     The Due Process clause "forbids the government to infringe [on]

21  fundamental liberty interests at all, no matter what process is provided, unless the

22  infringement is narrowly tailored to serve a compelling state interest." *Washington v.*

23  *Glucksberg*, 521 U.S. 702, 721 (1997) (internal quotations omitted).

24      88.     This applies to "fundamental rights and liberties which are deeply rooted in

25  this Nation's history and tradition and implicit in the concept of ordered liberty."

26  *Chavez v. Martinez*, 538 U.S. 760, 775 (2003) (internal quotations and citations

27  omitted) (*partially overruled on other grounds by Saucier v. Katz*, 533 U.S. 194

28  (2001)).

First Amended Complaint                              Case No. 8:20-cv-00877

89.     Substantive due process "includes more than the absence of physical restraint." *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997) (citation omitted).

90.     It protects—in addition to all the enumerated freedoms in the Bill of Rights—a wide array of liberties including the right to marry,[59] to have children,[60] to direct your children's education,[61] to privacy,[62] and to refuse unwanted medical treatment.[63] *Id*. 521 U.S. at 720.

91.     Citizens also have a fundamental right to be free from confinement without due process of law. *Hamdi v. Rumsfeld*, 542 U.S. 507, 531 (2004).

92.     It is self-evident that the right to freely come and go from one's home is a fundamental right. *See Aptheker,* 378 U.S. at 520.

93.     The "involuntary confinement of an individual for any reason, is a deprivation of liberty which the State cannot accomplish without due process of law." *Connor v. Donaldson*, 422 U.S. 563, 580 (1975). Also, any "confinement must cease when those reasons [giving rise to it] no longer exist." *Id*.

94.     Quarantine laws may be permitted as to infected individuals, but not the public at large. *Robinson v. State of California*, 370 U.S. 660, 666 (1962).

95.     A quarantine law that banned introduction of cattle into a state for several months of the year regardless of whether the cattle were diseased or not was held to be unconstitutional. *Railroad Company v. Husen*, 95 U.S. 465, 473 (1877).

96.     The State Order mandates that Californians stay at home and shut down their "non-essential" businesses.

97.     This caused Six's wedding venue to cancel its contract with her.

98.     The State Order violated and is still violating Six's fundamental

---

[59] *Loving v. Virginia*, 388 U. S. 1 (1967).
[60] *Skinner v. Oklahoma ex rel. Williamson*, 316 U. S. 535 (1942).
[61] *Meyer v. Nebraska*, 262 U. S. 390 (1923); *Pierce v. Society of Sisters*, 268 U. S. 510 (1925).
[62] *Griswold v. Connecticut*, 381 U. S. 479 (1965).
[63] *Cruzan v. Director, Mo. Dep't. of Health*, 497 U. S. 261 (1990).

21



First Amended Complaint                                    Case No. 8:20-cv-00877

constitutional right to liberty in the form of her right to marry.

99.   The State Order also violates the Medlins' fundamental right to liberty in the form of their right to direct their son's education and spend time with him.

100.   The State Order also violates Batten's fundamental constitutional rights to liberty and free association.

101.   The State also violates Ball's fundamental constitutional rights to liberty, free association, and right to earn a living.

102.   The State Order is tantamount to a state-wide confinement of most Californians, regardless of whether they are infected with COVID-19.

103.   Unless enjoined, Defendants will act under color of state law to deprive Plaintiffs of their right to liberty as protected by the Due Process Clause.

104.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the State Order.

105.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the State Order.

106.   Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION
### Equal Protection as enforced by 42 U.S.C. § 1983
### (By All Plaintiffs against All Defendants)

107.   Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.



First Amended Complaint

Case No. 8:20-cv-00877

108.   The Fourteenth Amendment to the U.S. Constitution provides that "[n]o State … deny to any person within its jurisdiction the equal protection of the laws."

109.   Equal protection principles revolve around "governmental classifications that affect some groups of citizens differently than others." *Engquist v. Oregon Dept. of Agriculture*, 553 U.S. 591, 128 S.Ct. 2146, 2152 (2008) (citations omitted).

110.   Equal protection has even been upheld when the government treated a "class of one" differently from others. *Willowbrook v. Olech*, 528 U.S. 562, 563, 145 L.Ed.2d 1060, 1074 (2000).

111.   The touchstone of this analysis is whether a state creates disparity "between classes of individuals whose situations are arguably indistinguishable." *Ross v. Moffitt*, 417 U.S. 600, 609, 94 S.Ct. 2437 (1974).

112.   Any classification that impairs a fundamental right is "presumptively invidious[.]" *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382 (1982) (holding that a state's denial of free public education to undocumented children was unconstitutional).

113.   The right to work and operate one's business is a fundamental right.

114.   Newsom's arbitrary, unilateral categorization of some businesses as "essential" and others as "non-essential" has shut down Plaintiff Six's wedding venue, the Medlins' son's school, Batten's school, and Ball's concert band while leaving other businesses open that have no connection to fighting the COVID-19 emergency.

115.   This disparate classification and treatment violates Plaintiffs' fundamental rights, and is presumptively invidious.

116.   Newsom must show that this disparate treatment "has been precisely tailored to serve a compelling governmental interest." *Plyler*, 457 U.S. at 217.

117.   As discussed above, marijuana retail stores operate in violation of federal law. Upon information and belief, Plaintiff Six's wedding venue, the Medlins' son's school, and Ball's concert band, all operate in compliance with applicable laws.

118.   Allowing a politically-connected business that violates federal law to continue operating during the pandemic while shutting down other businesses—such as



First Amended Complaint

Case No. 8:20-cv-00877

1   Plaintiff Six's wedding venue, the Medlins son's school, and Ball's concert band—that

2   follow the law, violates the core principles of equal protection.

3        119.   There is no compelling reason to shut down wedding venues, special needs

4   schools, and concert bands when other retail stores are allowed to remain open.

5        120.   There is not even a rational basis for this.

6        121.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to

7   declaratory relief and temporary, preliminary, and permanent injunctive relief

8   invalidating and restraining enforcement of the State Order.

9        122.   Plaintiffs found it necessary to engage the services of private counsel to

10  vindicate their rights under the law. Plaintiffs are therefore entitled to an award of

11  attorneys' fees pursuant to 42 U.S.C. § 1988.

### FOURTH CLAIM FOR RELIEF

### COMBINED VIOLATION OF THE FIFTH AND FOURTEENTH
### AMENDMENT RIGHTS TO DUE PROCESS AND EQUAL PROTECTION
### Enforcement of Fundamental Rights from the California Emergency Services Act
### (*By All Plaintiffs against All Defendants*)

17       123.   Plaintiffs incorporate herein by reference each and every allegation

18  contained in the preceding paragraphs of this Complaint as though fully set forth herein.

19       124.   The Fifth Amendment of the U.S. Constitution declares that "[n]o person

20  shall … be deprived of life, liberty, or property without due process of law." The Due

21  Process clause "forbids the government to infringe [on] fundamental liberty interests at

22  all, no matter what process is provided, unless the infringement is narrowly tailored to

23  serve a compelling state interest." *Washington*, 521 U.S. at 721 (internal quotations

24  omitted).

25       125.   The Fourteenth Amendment to the United States Constitution provides that

26  "[n]o State … deny to any person within its jurisdiction the equal protection of the

27  laws." Any classification that impairs a fundamental right is "presumptively

28  invidious[.]" *Plyler*, 457 U.S. at 216.



First Amended Complaint               Case No. 8:20-cv-00877

126.   Many of Californians' fundamental rights are contained in the California Emergency Services Act. Cal. Gov't Code § 8550, *et seq*.

127.   Newsom is authorized to manage state resources and agencies and coordinate efforts with the federal and local governments under the Act. Cal. Gov't Code §§ 8569, 8570-71.

128.   Notably absent is any authority to suspend substantive statutes, the U.S. Constitution, or the right of citizens to exercise their fundamental rights.

129.   The State Order violates these California statutes by denying due process and equal protection.

130.   The State Order denies due process by usurping the power of local health officials to declare quarantines without providing any process at all. Cal. Health and Safety Code § 120225; Cal. Gov't Code § 8634. The State Order provides for no opportunity for a hearing; no appeal; no reconsideration.

131.   If a local official declared a quarantine, then certain procedures must be followed. *Ex parte Martin*, 83 Cal. App. 2d 164 (1948).

132.   The fact that Newsom took over local health officials' authority and declared a statewide quarantine, does not exempt him from complying with due process.

133.   The State Order's position of "no process" is not due process.

134.   In addition, Newsom's violation of the California Emergency Services Act denies equal protection of the laws by allowing some businesses and professions to be exercised, but all other professions and events are prohibited.

135.   Newsom has not shown and cannot show that his arbitrary classifications of different businesses are "precisely tailored to serve a compelling governmental interest." *Plyler*, 457 U.S. at 217.

136.   Newsom is required to exercise his authority under the Emergency Services Act "to the fullest extent possible consistent with individual rights and



First Amended Complaint                                  Case No. 8:20-cv-00877

liberties." *Macias v. State of California*, 10 Cal.4th 844, 854, 897 P.2d 530, 536-37 (Cal. 1995).

137.   Newsom has not done so.

138.   Instead, he has shut down wedding venues and special needs schools while allowing some retail stores to remain open. He has banned musicians from performing and even practicing. He has shut down high school graduations and is preventing high school seniors from properly preparing for college.

139.   These are all violations of Plaintiffs' fundamental rights under the U.S. Constitution.

140.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the State Order.

141.   Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

**FIFTH CLAIM FOR RELIEF**

**VIOLATION OF THE CALIFORNIA CONSTITUTION**

**Right to Liberty (Cal. Const. Art. 1, § 1)**

***(By All Plaintiffs against All Defendants)***

142.   Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

143.   Since 1879, the California Constitution has provided intrinsic and unalienable rights and liberties to its citizens. Chief among those rights and liberties are those found in Article 1 of the California Constitution. Article 1, Sections 1 of the California Constitution provides, in pertinent part:

> All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy.

26

First Amended Complaint                                        Case No. 8:20-cv-00877

144.   Defendants' implementation of their State Order has not only interfered with Plaintiffs' rights and liberties as set forth under Article 1, Sections 1 of the California Constitution, but their discriminatory classification of "Non-Essential" businesses forced Plaintiff Six's wedding venue to close and cancel their contract with her. It also forced the Medlins' son's special needs school to close. It is preventing Ball from practicing his trade. It is derailing Batten's efforts to prepare for college.

145.   The State Order has proximately caused tremendous financial harm not just to Plaintiff Six in the form of the wasted money for engraved decorations and dated invitations; significant noneconomic harm to the Medlins by blocking their efforts to visit their son; devastating noneconomic harm to Batten by cancelling her high school functions and blocking her efforts to prepare for college; and preventing Ball from practicing his trade and bringing joy and hope to an entire community.

146.   The State Order's effects are also felt by the entire California economy, and the State Order will continue to have deleterious effects unless and until Defendants are enjoined by this Court from enforcing the State Order.

147.   California courts have held that Public Health Officials' authority over the rights of personal liberty is limited. Before exercising their full powers to quarantine, there must be "reasonable grounds [] to support the belief that the person so held is infected." *Ex parte Martin*, 83 Cal. App. 2d 164 (1948). Public Health Officials must be able to show "probable cause to believe the person so held has an infectious disease …" *Id.*

148.   California courts found that Public Health Officials could not quarantine 12 blocks of San Francisco Chinatown because of nine (9) deaths due to bubonic plague. *See Jew Ho v. Williamson*, 103 F. 10 (C.C. Cal. 1900), and *Wong Wai v. Williamson,* 103 F. 1 (C.C. Cal. 1900).

149.   The court found it "purely arbitrary, unreasonable, unwarranted, wrongful, and oppressive interference with the personal liberty of complainant" who had "never had or contracted said bubonic plague; that he has never been at any time exposed to the



First Amended Complaint                                          Case No. 8:20-cv-00877

danger of contracting it, and has never been in any locality where said bubonic plague, or any germs of bacteria thereof, has or have existed[.]" *Jew Ho*, 103 F. 10 (C.C. Cal. 1900).

150.   California courts have found that "a mere suspicion [of a contagious disease], unsupported by facts giving rise to reasonable or probable cause, will afford no justification at all *for depriving persons of their liberty* and subjecting them to virtual imprisonment under a purported order of quarantine." *Ex parte Arta*, 52 Cal. App. 380, 383 (1921) (emphasis added).

151.   In *Jew Ho v. Williamson,* 103 F. 10 (C.C. Cal. 1900), and *Wong Wai v. Williamson,* 103 F. 1 (CC Cal. 1900), the California courts found that there were more than 15,000 people living in the twelve blocks of San Francisco Chinatown who were to be quarantined. The courts found it unreasonable to shut down the ability of over 15,000 people to make a living because of nine deaths. This was one death for every 1,666 inhabitants of Chinatown.

152.   The population of California was estimated at 39,512,223 in July 2019 according to the U.S. Census Bureau.[64] The number of fatalities from COVID-19 in California, as of May 3, 2020, is 2,412.[65] This is only 0.0061 percent of the population, or approximately one death for every 16,382 Californians.

153.   Plaintiff Six has never had or contracted COVID-19 or had contact with COVID-19 patients. The Medlins have never had or contracted COVID-19 or had contact with COVID-19 patients and they have self-quarantined since mid-March from an abundance of caution.

154.   Requiring Plaintiff Six to reschedule her wedding four months later after all the dated invitations had been mailed and she had ordered numerous personalized

---

[64] Available as of May 3, 2020 at: https://www.census.gov/quickfacts/CA.
[65] Available as of May 7, 2020 at: https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/ncov2019.aspx.



First Amended Complaint                                                    Case No. 8:20-cv-00877

wedding items with the original wedding date thereon violated her rights to travel, liberty, and equal protection under the U.S. and California Constitutions.

155.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the State Order.

156.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorney fees and costs pursuant to California Code of Civil Procedure Section 1021.5.

**WHEREFORE**, Plaintiffs respectfully requests that this Court enter judgment against Defendants as follows:

A.    An order and judgment declaring that the State Order, facially and as-applied to Plaintiffs, violates the Fifth and Fourteenth Amendments to the U.S. Constitution and Article 1, Section 1 of the California Constitution;

B.    An order temporarily, preliminarily, and permanently enjoining and prohibiting Defendants from enforcing the State Order or otherwise interfering with Plaintiffs' constitutional rights and liberties;

C.    For attorneys' fees and costs pursuant to 42 U.S.C. § 1988, California Code of Civil Procedure Section 1021.5, and any other legal basis for such fees and costs as may apply;

D.    Such other and further relief as the Court deems appropriate and just.

Date: May 14, 2020                          DHILLON LAW GROUP INC.

                                    By:    /s/ Harmeet K. Dhillon
                                            HARMEET K. DHILLON (SBN: 207873)
                                            MARK P. MEUSER (SBN: 231335)
                                            GREGORY R. MICHAEL (SBN: 306814)

                                            Attorneys for Plaintiffs



First Amended Complaint                                Case No. 8:20-cv-00877