UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONICA SIX, et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>GAVIN NEWSOM, et al.,<br><br>  Defendants. | CASE NO. 8:20-cv-00877-JLS-DFM<br><br>**ORDER DENYING APPLICATION FOR TEMPORARY RESTRAINING ORDER AND FOR ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE (Doc. 13)** |

1

Before the Court is an Application for Temporary Restraining Order and for Order to Show Cause Why Preliminary Injunction Should Not Issue filed by Plaintiffs Monica Six, Derek and LaurieSue Medlin, Baily Batten, and Kenneth Ball. (App., Doc. 13.) Defendants Gavin Newsom, Xavier Becerra, Mark Ghilarducci, and Sonia Angell opposed. (Opp'n, Doc. 16.) Having considered the parties' briefs and supporting materials, the Court DENIES Plaintiffs' Application in its entirety.

## I. BACKGROUND

For the past several months, the coronavirus disease 2019 ("COVID-19") has spread rapidly throughout the United States and the world, taking over 300,000 lives worldwide; sending lasting shockwaves across global markets; and depriving millions of their livelihood as society grapples with a "new normal" in which otherwise-ordinary physical contact could have devastating ripple effects.

Like other countries around the world, on March 13, 2020, the United States declared a national emergency to aid in its response to the pandemic. (*See* First Am. Compl. ("FAC"), Doc. 12 ¶ 20, n.4.) A little over a week beforehand, on March 4, 2020, Defendant California Governor Gavin Newsom proclaimed a state of emergency in the State to facilitate its response to the spread of the virus within its borders. (*See* Ex. 1 to Echeverria Decl. ISO Opp'n, Doc. 16-3; FAC ¶ 22.) Then, on March 19, 2020, Governor Newsom issued Executive Order N-33-20, otherwise known as the "Stay-at-Home Order," in which he directed "all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors." (Ex. 2 to Echeverria Decl., Doc. 16-4 at 1.) The Order also provided an exception for "necessary activities," namely "access[ing] [] such necessities as food, prescriptions, and health care." (*Id.* at 2.)

While Plaintiffs' First Amended Complaint stops there, Governor Newsom has since initiated California's phased reopening. After announcing the "four 'Resilience Roadmap Stages' that California would use to guide its gradual reopening process" on

April 28, 2020 (*see* Ex. 3 to Echeverria Decl., Doc. 16-5 at 1), Governor Newsom indicated on May 4, 2020, in Executive Order N-60-20, that California would move into "Stage Two" of the reopening (*see* Ex. 6 to Echeverria Decl., Doc. 16-8 at 2). Accordingly, California is now in Stage Two, in which "retail (curbside and delivery only), related logistics and manufacturing, office workplaces, limited personal services, outdoor museums, child care, and essential businesses[1] can open with modifications." (Ex. 8 to Echeverria Decl., Doc. 16-10 at 1.) While the State has entered Stage Two, the Stay-at-Home Order is still in place, in its now-modified form. (*See id.*) As of May 8, 2020, individual counties that meet certain criteria may "move more quickly than other parts of the state through Stage 2 of modifying the Stay-at-Home order."[2]

On May 8, 2020, after Governor Newsom announced California's phased reopening, Plaintiffs, five California residents, filed the instant action, in which they allege that Governor Newsom's March 19, 2020 Stay-at-Home Order is unconstitutional. (*See* FAC ¶¶ 5–6, 11–14.) Plaintiffs also challenge the Stay-at-Home Order under the California Constitution and the California Emergency Services Act. (*Id.* ¶ 5.)

Plaintiff Monica Six was set to marry her fiancé on April 21, 2020, "the second anniversary of their first date." (*Id.* ¶ 11.) As a result of the Stay-at-Home Order, Six's wedding venue cancelled the April 21 wedding, rescheduling it for "later this summer." (*Id.*) Six claims that "the indefinite duration of the [Stay-at-Home] Order makes it uncertain whether she will be able to get married on the new date, either," without which certainty "she is unable to re-purchase invitations or decorations for her rescheduled wedding date." (*Id.*) According to Six, the opportunity "to get married [o]n a special anniversary . . . is now lost forever." (*Id.*)

Plaintiffs Derek and LaurieSue Medlin ("the Medlins") have a 20-year-old son with

---

[1] The State's essential workforce list is available at https://covid19.ca.gov/essential-workforce. (FAC ¶ 18 n.3.)

[2] *COVID-19 County Variance Attestation Form*, Cal. Dep't Pub. Health, https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/County_Variance_Attestation_Form.aspx (last updated May 18, 2020).

3

special needs who lives at a non-medical residential home that provides 24/7 care. (*Id.* ¶ 12.) Usually, the Medlins would visit their son "several times a week for at least two hours at a time" and "take him home with them for short periods of time each week." (*Id.*) Now, their son's residential home is restricting their visits to two thirty-minute visits per week, during which the Medlins must talk with their son through a mesh fence. (*Id.*) Because their son does not have the capacity to understand the rationale behind these restrictions and has a history of nervous breakdowns and self-harm, the Medlins allege that the Stay-at-Home Order "has greatly increased the likelihood that he will [harm himself] again." (*Id.*) And, "[f]or the Medlins, it is excruciating to be forcibly separated from their son, to not know how he is doing, and be unable to give their son the physical affirmation and affection that he needs and is accustomed to." (*Id.*)

Plaintiff Bailey Batten is a high school senior in San Diego County. (*Id.* ¶ 13.) Her senior prom, soccer banquet, and graduation ceremony were cancelled by her school "due to the [Stay-at-Home] Order." (*Id.*) Batten alleges that, as a result of the Order, "[s]he is not allowed to practice for the [A]dvanced [P]lacement exams with her peers and friends and is forced to study on her own," which "significantly harm[s] her college plans to begin studies in the fall to become a doctor." (*Id.*)

Finally, Plaintiff Kenneth Ball, a musician, is a member of a band that has been unable to practice in person or perform at events due to the pandemic. (*See id.* ¶ 14.) "Although his instrument cannot be played while wearing a mask, his band has access to facilities where each of the musicians can maintain safe social distancing," but Ball claims that the Stay-at-Home Order "bans him and his fellow musicians from even this opportunity." (*Id.*) Ball further alleges that the Stay-at-Home Order constitutes a "ban of [his] musical pursuits." (*See id.*)

In their operative Complaint, Plaintiffs assert five claims: (1) violation of the Fifth Amendment to the Constitution (right to travel); (2) violation of the Due Process Clause of the Fifth Amendment to the Constitution (right to liberty); (3) violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution; (4) violation of the

1 Fifth and Fourteenth Amendment rights to due process and equal protection of the laws
2 based on "enforcement of fundamental rights from the California Emergency Services
3 Act"; and (5) violation of Article 1, section 1 of the California Constitution.  (*Id.* ¶¶ 67–
4 156.)

On May 15, 2020, Plaintiffs filed the instant Application, in which they seek a temporary restraining order pursuant to which "Defendants shall permit the following actions: Six to get married on her rescheduled date, the Medlins to freely visit their son, Batten to study with her teachers and/or fellow students to prepare for college, and Ball to practice and perform with his fellow concert band musicians."  (App. at 21.)  Plaintiffs also ask that the Court issue an order for Defendants to show cause why a preliminary injunction should not issue.  (*Id.*)

## II.  LEGAL STANDARD

"The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction."  *Lockheed Missile & Space Co. v. Hughes Aircraft Co.*, 887 F. Supp. 1320, 1323 (N.D. Cal. 1995).  Like a preliminary injunction, a temporary restraining order is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  "The underlying purpose of a TRO is to preserve the status quo and prevent irreparable harm before a preliminary injunction hearing may be held."  *Jones v. H.S.B.C. (USA)*, 844 F. Supp. 2d 1099, 1100 (S.D. Cal. 2012) (citing *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cty.*, 415 U.S. 423, 439 (1974)).

Under *Winter*, a plaintiff may secure a temporary restraining order if he establishes "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter*, 555 U.S. at 20).  Alternatively, under the

Ninth Circuit's "sliding-scale test," a temporary restraining order is appropriate if a plaintiff shows "[1] serious questions going to the merits and [2] a balance of hardships that tips sharply towards the plaintiff[,] . . . [3] a likelihood of irreparable injury[,] and [4] that the injunction is in the public interest." *Wild Rockies*, 632 F.3d at 1135 (internal quotation marks omitted); *see also id.* at 1133 ("[A] weaker claim on the merits can still justify a [temporary restraining order] depending on the amount of 'net harm' that could be prevented by the injunction.").

## III.    DISCUSSION

### A.    Likelihood of Success on the Merits

Plaintiffs' Application fails to acknowledge the well-established test that governs when courts are asked to analyze the constitutionality of state powers to protect the public health. Over 100 years ago, even before the world faced the 1918 influenza pandemic, also known as the Spanish flu, the Supreme Court upheld states' (and localities') authority under their police power "to enact quarantine laws and health laws of every description" in order to "protect [themselves] against an epidemic of disease which threatens the safety of [their] members." *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 25, 27 (1905) (internal quotation marks omitted). Recognizing that such enactments could pose a significant risk to individual liberties, the Supreme Court reasoned that preservation of the general welfare requires such sacrifices: "in every well-ordered society charged with the duty of conserving the safety of its members[,] the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand." *Id.* at 29. Ultimately, the Supreme Court explained, "*it [i]s the duty of the constituted authorities primarily to keep in view the welfare, comfort, and safety of the many, and not permit the interests of the many to be subordinated to the wishes or convenience of the few*." *Id.* at 27–29 (emphasis added).

But the Supreme Court appreciated that some level of scrutiny was necessary, for states could quite conceivably exercise their emergency powers "in such an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons." *Id.* at 28. To balance this concern with the requisite deference to the enacting body during a public health crisis, the Supreme Court articulated the following governing test:

> [I]f a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.

*Id.* at 31. In other words, "when a state or locality exercises emergency police powers to enact an emergency public health measure, courts will uphold it unless (1) there is no real or substantial relation to public health, or (2) the measures are 'beyond all question' a 'plain, palpable invasion of rights secured by [ ] fundamental law.'" *Cross Culture Christian Ctr. v. Newsom*, — F.Supp.3d —, No. 2:20-CV-00832-JAM-CKD, 2020 WL 2121111, at *4 (E.D. Cal. May 5, 2020) (quoting *Jacobson*, 197 U.S. at 31).

Plaintiffs' claims cannot survive under *Jacobson*'s governing standard.

### 1. Relation to Public Health

Plaintiffs do nothing to refute Defendants' proffered evidence that "COVID-19 can spread quickly" and is more likely to spread "when people are in close contact with one another (within about six feet)." (Watt Decl. ISO Opp'n, Doc. 16-1 ¶¶ 10–11.) Moreover, although many individuals infected with COVID-19 are asymptomatic, they can still spread the virus. (*See id.* ¶ 13.) "Unchecked, COVID-19 spreads exponentially and[,] over 10 transmission cycles, one person could be responsible for 1,024 other people contracting the virus." (*Id.* ¶ 10.) Accordingly, physical distancing measures like California's Stay-at-Home Order are critical to slowing down the spread of the virus (*see*

7

*id.* ¶¶ 10–11, 15–17), rendering the measure substantially related to public health.  *See Givens v. Newsom*, No. 2:20-CV-00852-JAM-CKD, 2020 WL 2307224, at *4 (E.D. Cal. May 8, 2020) (reaching the same conclusion).  Plaintiffs' claim that the Stay-at-Home Order is out of touch with "scientific data" because "[a] variety of studies are showing that infection rates and hospitalization rates around the country and in California are much lower than originally predicted" (*see* App. at 4–5) fails to account for the possibility that numbers are lower *because* of the Stay-at-Home Order.  Even if that is not the case, that numbers are lower than predicted certainly does not support a conclusion that the Stay-at-Home Order has no real or substantial relation to public health.

### 2. Whether the Measure Constitutes a Plain, Palpable Invasion of Plaintiffs' Rights

The Court addresses Plaintiffs' claims one by one and (largely) as they are framed in Plaintiff's operative Complaint.

#### i. Right to Travel

"The word 'travel' is not found in the text of the Constitution.  Yet the 'constitutional right to travel *from one State to another*' is firmly embedded in [Supreme Court] jurisprudence."  *Saenz v. Roe*, 526 U.S. 489, 498 (1999) (emphasis added) (quoting *United States v. Guest*, 383 U.S. 745, 757 (1966)).  As recognized by the Supreme Court, the right to travel "embraces at least three different components."  *Saenz*, 526 U.S. at 500.

> It protects the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State.

*Id.*  But neither the Supreme Court nor the Ninth Circuit have recognized as a protected component the right to *intrastate* travel, which Plaintiffs invoke.  *See Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 944, 944 n.7 (9th Cir. 1997).  Plaintiffs cite a single case, *Kent v. Dulles*, 357 U.S. 116 (1958), to support their claim that the Constitution protects

8

the right to intrastate travel. (*See* App. at 8.) But that case does not support their claim—it concerns *foreign* travel (passports, more specifically) and makes no mention of intrastate travel. *See id.* at 121, 126–27. Because any restrictions on Plaintiffs' (and California residents') right to travel involve intrastate travel, Plaintiffs' claim for violation of the right to travel is not likely to succeed on the merits, nor does it raise a serious question going to the merits.

### ii. Substantive Due Process (Right to Liberty)

"The Due Process Clause of the Fourteenth Amendment includes a substantive component that protects certain individual liberties from state interference." *Franceschi v. Yee*, 887 F.3d 927, 937 (9th Cir.) (internal quotation marks omitted), *cert. denied*, 139 S. Ct. 648 (2018). But "[t]he range of liberty interests that substantive due process protects is narrow and [o]nly those aspects of liberty that we as a society traditionally have protected as fundamental are included within the substantive protection of the Due Process Clause." *Id.* (second alteration in original) (internal quotation marks omitted). "Substantive due process has, therefore, been largely confined to protecting fundamental liberty interests, such as marriage, procreation, contraception, family relationships, child rearing, education and a person's bodily integrity, which are 'deeply rooted in this Nation's history and tradition.'" *Id.* (quoting *Moore v. City of E. Cleveland*, 431 U.S. 494, 503 (1977); then citing *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 851 (1992)).

Plaintiffs invoke a slew of fundamental rights allegedly infringed by the Stay-at-Home Order. Plaintiff Six claims a violation of her right to marry; the Medlins claim a violation of their "right to direct their son's education and spend time with him"; Batten claims a violation of her right to free association; and Ball claims a violation of his rights to free association and to earn a living. (*See* FAC ¶¶ 98–101.) While the fundamental rights cited by Plaintiffs exist and are protected, Plaintiffs' alleged circumstances implicate none of these rights. For that reason, Plaintiffs' claims do not have a likelihood of success on the merits and do not raise a serious question going to the merits.

### 1. Right to Marry

To be sure, "the [Supreme] Court has long held the right to marry is protected by the Constitution." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2598 (2015). But, fatal to Six's claim, the Stay-at-Home Order—in either its original or revised form—does not interfere with what the right to marry protects. *See id.* at 2599–600 (explaining the principles the right to marry, as interpreted by the Supreme Court, seeks to protect: (1) "the right to personal choice regarding marriage[, which] is inherent in the concept of individual autonomy"; that (2) "the right to marry is fundamental because it supports a two-person union unlike any other in its importance to the committed individuals"; and that (3) the right to marry "safeguards children and families and thus draws meaning from related rights of childrearing, procreation, and education"); *see also Salisbury v. List*, 501 F. Supp. 105, 109 (D. Nev. 1980) ("When the right to marry is involved, a regulation significantly interferes with exercise of the right when it directly and substantially interferes with the very decision to marry or not to marry. That is, the freedom of choice is intruded upon.") (internal citation omitted). With those principles in mind, the constitutional right to marry certainly does not encompass the right to get married at a specific venue in front of a crowd on one's second first-date anniversary during a global pandemic. As Defendants point out, Six and her fiancé are able to get married and have been able to do so since at least April 30, 2020. (*See* Ex. 9 to Echeverria Decl., Doc. 16-11 at 1.) Six's claim based on her right to marry is not likely to succeed on the merits, nor does it raise a serious question going to the merits.

### 2. "Right to Direct Son's Education and Spend Time with Him"

The Court—though it is sympathetic to the Medlins' plight—does not know what to make of the Medlins' characterization of their constitutional rights. The Medlins nowhere mention any sort of interference with their son's education, except that partway through the operative Complaint, they switch from characterizing their son's residence as a residential home facility to characterizing it as a special needs school. (*Compare* FAC ¶

10

12, *with id.* ¶ 144.) Ultimately, the Medlins' allegations concern interference with their visitation rights and the potential impact of that interference on their son's mental health. (*See id.* ¶ 12.) The relevant right, therefore, is the "right to visit their son and spend time with him" (*id.* ¶ 78).

Plaintiffs do not cite a single case in support of their claim that their interest is cognizable under substantive due process. Although not argued by the Medlins, the Court recognizes that "[i]t is well established that a parent has a fundamental liberty interest in the companionship and society of his or her child and that the state's interference with that liberty interest without due process of law is remediable under 42 U.S.C. § 1983," *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Whether, under normal circumstances, that liberty interest would encompass what the Medlins assert here is a different question, and one that they do not even attempt to answer. Regardless, the Medlins' claim suffers from another flaw, namely that, as Defendants point out, the Stay-at-Home Order is not behind the restrictions imposed by the Medlins' son's residential facility. (*See* Ex. 10 to Echeverria Decl., Doc. 16-12; Opp'n at 14–15.) Rather, to protect the vulnerable populations residing in such facilities, along with their caregivers, the facilities have had to implement temporary access restrictions. The state-interference aspect, which is necessary to the Medlins' claim, is therefore absent, and their claim is not likely to succeed on the merits, nor does it raise a serious question going to the merits.

### 3. Right to Free Association

Both Batten and Ball allege State interference with their right to free association. Batten seeks to associate with an amorphous group of "her peers and friends" for purposes of studying for Advanced Placement exams, while Ball seeks to associate with members of his band to practice and perform together. (*See* FAC ¶¶ 13–14.) "There are two distinct forms of freedom of association: (1) freedom of intimate association, protected under the Substantive Due Process Clause of the Fourteenth Amendment; and (2) freedom of expressive association, protected under the Freedom of Speech Clause of the First Amendment." *Erotic Serv. Provider Legal Educ. & Research Project v. Gascon*, 880 F.3d

1  450, 458 (9th Cir. 2018) (citing *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18 (1984)),
2  *amended*, 881 F.3d 792 (9th Cir. 2018).  Plaintiffs Batten and Ball invoke the former.
3        Although "intimate association receives protection as a fundamental element of
4  personal liberty," that protection "extends only to 'certain kinds of highly personal
5  relationships.'" *Gascon*, 880 F.3d at 458 (citing *U.S. Jaycees*, 468 U.S. at 617–18; then
6  quoting *id.* at 618).  "The personal affiliations that exemplify the[] considerations
7  [undergirding the protection afforded to intimate associations] . . . are those that attend the
8  creation and sustenance of a family." *U.S. Jaycees*, 468 U.S. at 619.  "As a general matter,
9  only relationships with these sorts of qualities are likely to reflect the considerations that
10 have led to an understanding of freedom of association as an intrinsic element of personal
11 liberty.  Conversely, an association lacking these qualities—such as a large business
12 enterprise—seems remote from the concerns giving rise to this constitutional protection."
13 *Id.* at 620.  "Between these poles, of course, lies a broad range of human relationships that
14 may make greater or lesser claims to constitutional protection from particular incursions by
15 the State." *Id.*  "Determining the limits of state authority over an individual's freedom to
16 enter into a particular association therefore unavoidably entails a careful assessment of
17 where that relationship's objective characteristics locate it on a spectrum from the most
18 intimate to the most attenuated of personal attachments." *Id.*  Plaintiffs do nothing in the
19 way of either citation to authority or argument to assist the Court in situating their claimed
20 associations along the relevant spectrum.
21       But the more fundamental flaw is that neither Batten nor Ball explain how the Stay-
22 at-Home Order, especially in its current form, interferes with their claimed *associations*
23 rather than their desired activities.  Like many students throughout the country and the
24 world, Batten may study for her exams with her peers and friends using platforms like
25 Zoom, Microsoft Teams, Google Hangouts, and the like.  Her personal preference not to
26 do so is not protected by the Constitution.  Ball, for his part, does not explain why or how
27 the Stay-at-Home Order prevents him from maintaining his *association* with his fellow
28 band members while they are on hiatus from practicing and performing.  Like Batten and

her peers, Ball and other band members may continue to share their love of music on virtual platforms. As for Ball's more specific desire to continue performing in front of crowds: the Court fails to see how that falls under the right to intimate association.

"There are manifold restraints to which every person is necessarily subject for the common good. On any other basis organized society could not exist with safety to its members." *Jacobson*, 197 U.S. at 26. Neither Batten nor Ball can succeed in converting what is temporary inconvenience into a substantive due process claim.

### 4. Right to Earn a Living

The sum of Ball's allegations reveals that he is not alleging that the State is depriving him of his right to earn a living, period, but rather that it is depriving him of his right to earn a living *in the profession of his choice*. (*See* FAC ¶ 14.) As Defendants point out, however, that right protects against "a complete prohibition of the right to engage in a calling" and not against brief interruptions to that pursuit. *See Conn v. Gabbert*, 526 U.S. 286, 292 (1999). Indeed, the Supreme Court "has indicated that the liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment, but a right which is nevertheless subject to reasonable government regulation." *Id.* at 291–92. The Supreme Court has also stated that, in a pandemic, regulations are unreasonable only when they represent, beyond question, "a plain, palpable invasion of rights secured by the fundamental law." *Jacobson*, 197 U.S. at 31. In light of the scope of the right to earn a living, Ball's claim as to this right is not likely to succeed on the merits, nor does it raise a serious question going to the merits.

### iii. Equal Protection Clause

Plaintiffs predicate their claim on the State's different treatment of "essential" and "non-essential" businesses and activities. (*See* FAC ¶ 114.) "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne*

*Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). Here, "[t]he State is treating certain businesses and activities differently based on their degree of risk to the public health." (Opp'n at 19; *see also Essential workforce*, COVID19.CA.GOV, https://covid19.ca.gov/essential-workforce/ (last updated May 6, 2020) (cited in FAC ¶ 18 n.3).) Plaintiffs fail to show that California is treating similarly situated businesses and activities differently, except that they question the logic of the State's risk assessment (*see, e.g.*, FAC ¶¶ 28–33, 114).

Even assuming that Plaintiffs could show that similarly "risky" businesses and activities were being treated differently, California's essential/non-essential distinction does not disadvantage a suspect class, as required for an equal protection claim that is not based on classifications "that impinge upon the exercise of a fundamental right," *Plyler*, 457 U.S. at 216–17 (internal quotation marks omitted). And the deference accorded the State's classification under *Jacobson* means this claim is not likely to succeed on the merits, nor does it raise a serious question going to the merits. *Cf. Jacobson*, 197 U.S. at 28 ("Smallpox being prevalent and increasing at Cambridge, the court would usurp the functions of another branch of government if it adjudged, as matter of law, that the mode adopted under the sanction of the state, to protect the people at large was arbitrary, and not justified by the necessities of the case.").

### iv. Procedural Due Process

Plaintiffs' procedural due process claim is a hodgepodge of citations to state and federal law—so much so that Defendants incorrectly concluded that "Plaintiffs discuss only a substantive due process claim" (Opp'n at 18 n.15). Plaintiffs' procedural due process claim appears to be that they were entitled to some process before Governor Newsom imposed the Stay-at-Home Order. (*See* FAC ¶¶ 131–33.) But "governmental decisions which affect large areas and are not directed at one or a few individuals do not give rise to the constitutional procedural due process requirements of individual notice and hearing; general notice as provided by law is sufficient." *Halverson v. Skagit Cty.*, 42 F.3d 1257, 1261 (9th Cir. 1994), *as amended on denial of reh'g* (Feb. 9, 1995). Hence, this

claim is not likely to succeed on the merits, nor does it raise a serious question going to the merits.

### v. State Law Claims

Plaintiffs' procedural due process and/or their equal protection claim is also based on the California Emergency Services Act. Their fifth and final claim for relief is based on violations of the California Constitution. Under *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984), these claims are barred by the Eleventh Amendment. *See id.* at 124–25.

### B. Remaining Factors

Because the Court concludes that Plaintiffs' claims are unlikely to succeed on the merits—indeed, that no serious questions going to the merits exist—it need not consider the remaining factors. *See Wild Rockies*, 632 F.3d at 1131, 1135; *Cross Culture*, 2020 WL 2121111, at *8; *Givens*, 2020 WL 2307224, at *9; *Gish v. Newsom*, No. EDCV 20-755-JGB-KK, 2020 WL 1979970, at *7 (C.D. Cal. Apr. 23, 2020).

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiffs' Application for Temporary Restraining Order and for Order to Show Cause Why Preliminary Injunction Should Not Issue.

DATED: May 22, 2020

_____
JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE

15